## AEROJET–GENERAL CORPORATION

v.

## The UNITED STATES.

### No. 332–72.

United States Court of Claims.

Dec. 14, 1977.

Alan V. Washburn, Washington, D.C., Atty. of record, for plaintiff. J. C. Andreason, Sacramento, Cal., of counsel.

Frances L. Nunn, Washington, D.C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D.C., for defendant. John Van Horne, Washington, D.C. , of counsel.

Before DAVIS, KUNZIG and BENNETT, Judges.

### OPINION

PER CURIAM:

In this case involving the reimbursability of independent research and development costs (IR&D), and the impact of section 203 of Pub.L.No.91–441, 84 Stat. 906 (Oct. 7, 1970), Trial Judge Willi has determined that plaintiff is entitled to prevail. Both parties have filed exceptions, but the plaintiff is satisfied with the end-result, seeking merely some changes in the trial judge's opinion

and findings. The court has considered the oral argument as well as the briefs and exceptions. The conclusion is that we agree with the trial judge's opinion (which is set forth *infra*), as supplemented and modified by the following paragraphs.*

■ We emphasize that we do not understand the trial judge's opinion as questioning the validity of a cost-sharing undertaking where that is voluntarily agreed upon by the contractor and the Government. The case involves only the propriety under § 203 of Pub.L.No.91–441 of the unilateral imposition by the Government of such a cost-sharing arrangement upon the contractor, against the latter's will. There is no intimation in our holding that the contractor and the procurement agency are forbidden to adopt such an arrangement if they both wish to do so.

We also add to the trial judge's opinion some discussion of the defendant's contention, stressed at oral argument, that the $950,000 figure chosen by the contracting officer represented a reasonable specific dollar ceiling for IR&D—a specific ceiling permissible under § 203 of Pub.L.No.91–441. Plaintiff says that no specific dollar ceiling is ever allowable under the statute— even if the Government wishes for good cause to control research and development by establishing a top limit on such expenditures by its contractor—but we need not reach or decide that question. The reason is that it is clear that, in this instance, the contracting officer did not attempt to set the $950,000 as a true ceiling limiting plaintiff's total expenditures for independent research and development. The findings are plain that the $950,000 figure represented solely the contracting officer's attempt to make plaintiff bear by itself all costs over that amount, *i. e.* an attempt to impose cost sharing upon the plaintiff. He did not ask plaintiff to restrict its IR&D to $950,000, but was quite willing for more to be spent so long as the Government would be responsible only for its pro rata share of that sum. The contracting officer insisted on such cost-sharing because he believed that it was

a good prod to increased efficiency, not because he thought $950,000 was enough for plaintiff to spend on the IR&D involved here.

■ For the reasons given by the trial judge together with those stated above, we hold that plaintiff is entitled to recover. The parties have agreed that, on the basis we decide the case, the amount of the judgment should be $368,963.16. We enter judgment for plaintiff in that amount.

## OPINION OF TRIAL JUDGE

WILLI, Trial Judge: Plaintiff is a large defense contractor comprised of several operating divisions, one of which is Aerojet ElectroSystems Company (AESC). In the fiscal year ended November 30, 1971, AESC was performing a number of cost-type military procurement contracts. During that period it incurred independent research and development (IR&D) costs totaling $1,084,-438.57 for which it sought reimbursement under the procurement contracts as indirect expenses allocable thereto. It has been agreed for purposes of this litigation that those costs were reasonable in amount, were for projects that had a potential relationship to a military function or operation, and were properly allocable to Department of Defense (DOD) contracts (as opposed to AESC contracts with others). In these circumstances defendant's contracting officer, believing that as a stimulus to efficiency a contractor could lawfully be required to absorb a portion of otherwise recoverable IR&D costs, was agreeable to reimbursement of only $950,000 of the $1,084,438.57. When AESC rejected that offer of partial reimbursement the contracting officer, acting in conformity with stated DOD policy, limited AESC's reimbursement to $712,500 (75 percent of $950,000). After completing an unsuccessful administrative appeal of the contracting officer's action, plaintiff brought the present suit for the unreimbursed balance of AESC's IR&D costs for the fiscal year ended November 30, 1971.

To the extent that the trial on which defendant insisted produced facts beyond

---

* The court also adopts the trial judge's findings but they are not printed since the necessary facts are stated in this *per curiam* opinion, including the trial judge's opinion.

those evident from the pleadings, they proved to be of only background significance. Subsequent briefing found the plaintiff urging at great length a varied assortment of legal contentions of a largely superfluous nature. None of this welter of activity has changed the question for decision from that clearly posited by the pleadings; whether section 203 of Pub.L. No. 91–441, 84 Stat. 906,[1] authorizes the Secretary of Defense to condition his approval of the amount of IR&D costs for which a contractor may be reimbursed, on the latter's willingness to absorb a portion of those costs that is admittedly otherwise reimbursable. For the reasons that follow, it must be concluded that however meritorious such a grant might have been as a matter of policy, Congress conferred no such authority.

IR&D costs are those costs incurred by a contractor, in this instance AESC, for research and development *not* directly sponsored by a contract, grant or other arrangement. Such costs are therefore not recovered by the contractor nor budgeted by DOD in the same way as similar-type costs pertaining to the performance of an R&D

1. The statutory language, enacted October 7, 1970, is as follows:

"SEC. 203. (a) Funds authorized for appropriation to the Department of Defense under the provisions of this or any other Act shall not be available after December 31, 1970, for payment of independent research and development or bid and proposal costs unless the work for which payment is made has, in the opinion of the Secretary of Defense, a *potential* relationship to a military function or operation and unless the following conditions are met—

"(1) the Secretary of Defense, prior to or during each fiscal year, negotiates advance agreements establishing a dollar ceiling on such costs with all companies which during their last preceding fiscal year received more than $2,000,000 of independent research and development or bid and proposal payments from the Department of Defense, the advance agreements thus negotiated (A) to cover the first fiscal year of each such contractor beginning on or after the beginning of each fiscal year of the Federal Government, and (B) to be concluded either directly with each such company or with those product divisions of each such company which contract directly with the Department of Defense and themselves received more than $250,000 of such payments during their company's last preceding fiscal year;

"(2) the independent research and development portions of the advance agreements thus negotiated are based on company submitted plans on each of which a technical evaluation is performed by the Department of Defense prior to or during the fiscal year covered by such advance agreement; and

"(3) no payments for independent research and development or bid and proposal costs are made by the Department of Defense to any company or product division with which an advance agreement is required by subsection (a)(1) of this section, except pursuant to the terms of that agreement.

"(b) In the event negotiations are held with any company or product division with which they are required under subsection (a)(1) of this section, but no agreement is reached with any such company or product division, no payments for independent research and development or bid and proposal costs shall be made to any such company or product division during the fiscal year for which agreement was not reached, except in an amount substantially less than the amount which, in the opinion of the Department of Defense, such company or product division would otherwise have been entitled to receive, subject to appeal by such company or product division under regulations to be prescribed by the Secretary of Defense.

"(c) The Secretary of Defense shall submit an annual report to the Congress on or before March 15, 1971, and on or before March 15 of each succeeding year, setting forth—

"(1) those companies with which negotiations were held pursuant to subsection (a)(1) of this section prior to or during the preceding fiscal year of the Federal Government, together with the results of those negotiations;

"(2) the latest available Defense Contract Audit Agency statistics, estimated to the extent necessary, on the independent research and development or bid and proposal payments made to major defense contractors, whether or not covered by subsection (a)(1) of this section during the preceding calendar year; and

"(3) the manner of his compliance with the provisions of this section, and any major policy changes proposed to be made by the Department of Defense in the administration of its contractors' independent research and development and bid and proposal programs.

"(d) The provisions of this section shall apply only to contracts for which the submission and certification of cost or pricing data are required in accordance with section 2306(f) of title 10, United States Code.

"(e) Section 403 of Public Law 91–121 (83 Stat. 204) is hereby repealed."

contract. Instead, the funds that are used to reimburse IR&D costs are typically drawn from DOD appropriations for procurement of military hardware. These costs are reimbursed from that source as a part of the indirect expense of the contractor's performance of such procurement contracts.

Closely related to IR&D costs are so-called bid and proposal (B&P) costs. By definition, those are costs incurred for preparing bids or proposals on potential government and non-government contracts or projects, including the development of both cost and engineering data necessary to support such bids and proposals. From the standpoint of funding by the Government and recovery by the contractor, the comments already made in respect to IR&D costs apply equally to B&P costs.

Prior to 1960 IR&D costs were generally not recoverable at all under cost-type military procurement contracts. Between 1960 and 1970 recovery thereunder was governed solely by provisions of the Armed Services Procurement Regulations (ASPR). ASPR § 15.205–35 [32 C.F.R. § 15.205–35 (1970)], provides that IR&D costs are recoverable to the extent that they are (1) reasonable in amount, (2) are related to product lines for which the Government has contracts, and (3) are allocated to all of the contractor's work on such product lines. Finding 4. In hortatory terms, the same regulation advances two proposals that are pertinent for present purposes; first, that where the work of the contractor involved in predominantly with the Government an advance agreement, as described in ASPR § 15.107, is particularly desirable; and second, that "In recognition that cost sharing of the contractor's independent research and development program may provide motivation for more efficient accomplishment of such program, it is desirable in some cases that the Government bear less than an allocable share of the total cost of the program." Finding 4. In turn, ASPR § 15.107 counsels the desirability of the contractor and the Government entering into an agreement as to the allowability of IR&D costs (among many others) in advance of their incurrence "* * * in order to avoid possible subsequent disallowance or dispute based on unreasonableness of non-allocability * *." The same regulation explicitly states, however, that the absence of an advance agreement as to any element of cost will not, in itself, serve to make that element either allowable or unallowable. Finding 4. The incorporation of the latter principle in ASPR reflects acceptance of a 1967 holding to that effect by the Armed Services Board of Contract Appeals in *Technical Communications Corp.*, 67–2 BCA ¶ 6525.

The first piece of legislation relating to the subject of Government reimbursement of IR&D costs was contained in section 403 of Pub.L.No.91–121, 83 Stat. 207, a general military appropriations bill for the fiscal year 1970. That legislation, which was the immediate forerunner of Pub.L.No.91–441, *supra*, originated as S.2546, 91st Cong., 1st Sess. As introduced and as reported to the Senate by its Armed Services Committee, the Bill contained nothing pertaining to IR&D costs. In the course of floor consideration Senator Proxmire offered an amendment to the Bill, adding the following provision (115 Cong.Rec., Part 19, at 25597):

> Sec. 402. Funds authorized for appropriation under the provisions of this Act shall not be available for payment of independent research and development, bid and proposal, and other technical effort costs in a total amount in excess of $468,000,000. The foregoing limitation shall not apply in the case of formally advertised contracts or to other firmly fixed price contracts compet[it]ively awarded.

The Senator, who was to be the author and principal spokesman in support of this and follow-up legislation imposing Congressional surveillance and control of Government reimbursement for IR&D costs, explained the purpose and need for his amendment as follows (115 Cong.Rec., Part 19, at 25598–600):

MR. PROXMIRE. Mr. President, the Department of Defense spends billions of dol-

lars each year on research and development contracts. Many persons have questioned the high level of military spending in this area, and the Armed Services Committee made a significant reduction in the funds authorized this year, a reduction which I certainly applaud and support.

There is another, lesser known R. & D. program, however, distinct from the multi-billion-dollar contract program which goes by the name of Independent R. & D. It is an apt title for this program, for the contractors who receive I.R. & D. funds are free to spend them independent of any contracts they may have with the Government, and independent of almost all Government controls.

*Last year $685 million was spent by the Department of Defense for I.R. & D. In view of the fact that no contractual controls were exercised over these public funds, and very little administrative controls of any kind, very serious questions need to be raised about the management of this program.*

But in view of the fact that the Pentagon is already spending billions of dollars on its R. & D. contracts, an even more serious question must be asked: What is the justification for this program? *How do we justify spending about $8 billion a year on military R. & D. contracts, and another $685 million on non-contracted Independent R. & D.?* Does this not represent duplication of effort of the most extreme kind?

Independent R. & D. represents one of the most serious and little known problems in Government procurement. *It is a disturbing fact that the Department of Defense exercises little or no control over the amount of public money paid to contractors for Independent R. & D. and related expenses.* What is even more disturbing is the fact that Department of Defense is now planning to completely eliminate the little control it now exercises and instead to substitute a formula to pay such costs.

In order to fully understand the magnitude of the problem, a full explanation of independent research and development and its related costs is necessary.

Let me point out first of all that Independent R. & D. is not the same as research and development. It is essential that the two programs be clearly distinguished. In contrast to federally contracted research and development, I.R. & D. is not sponsored, or administered directly by the Government. Under an I.R. & D. program, as distinguished from a Government contracted R. & D. program, the contractor is free to decide whether to perform I.R. & D. in the area of military products or commercial items. Under I.R. & D. programs, the initiation, control, and direction of I.R. & D. projects rests with the independent contractor, not the Government, as under normal R. & D. *[O]f crucial importance under an I.R. & D. program is the fact that the work done does not have to be directed toward the completion of government contract work. It can be totally unrelated to government business.*

Closely related to I.R. & D. are two other technical cost items normally considered with I.R. & D. The first of these are bidding and proposal expenses. These costs result from the technical effort involved in preparing bids and proposals for Government contract work. These costs are always underwritten 100 percent by the Government. The significance of this fact will become clear shortly. The second related area of technical expense is known as Other Technical Effort—OTE. Despite repeated efforts, I have been unable to obtain a clear and satisfactory definition of this category of expense from the Pentagon. No one seems to be able to precisely define the nature or purposes of this expense item. The Government Accounting Office, in an extensive study released last July suggests that other technical effort should be considered along with independent research and development since "it appears that a substantial portion of this amount involves technical effort similar to I.R. & D." Like bidding and proposal expenses, other technical effort expenses are always underwritten 100 percent by the Government.

Essential to an understanding of independent research and development and these

two related areas of technical costs is the fact that the Government does not contract for the work. *In effect, the Government is presented a bill for services rendered which it never specifically requested.* The usual justification for this astonishing practice is that I.R. & D. provides the broad technical capability needed by a company to meet future Government contract needs. Exactly what capabilities are being developed has never been clear. The term "technical capability" is so broad and so vague that literally anything has been accepted. Current armed services procurement regulations state:

"An I.R. & D. project, to be acceptable, must be related to the product lines for which the government has contracts."

*The interpretation of the term "product lines" has been unclear since the publication of the armed services procurement regulations.* [Emphasis added.]

\*　\*　\*　\*　\*　\*

\*　\*　\* *The expenditure of I.R. & D. moneys is going for research activities totally unrelated to military needs.* Defense contractors are encouraged to use DOD funds to expand their commercial business and on projects designed to assist in the solution of our domestic problems. Mr. President, if we need better housing, why should not the money be given to the Department of Housing and Urban Development which specializes in this area? Does it make sense to use our military program to support nonmilitary projects in order to justify an outmoded form of expenditure known as independent research and development? If the Government really needs increased research into our domestic problems, let us give the money to those who are best equipped to spend it—those people who are specialists in the field who can give the taxpayer the most for his research dollar.

The almost total lack of control over independent R. & D. by the Government is dramatically shown by a review of recent expenditures for this work. *A recent DOD audit covering 94 of the Department's major contractors shows that from a total of* *$459 million in 1963, I.R. & D. and related costs have skyrocketed to $685 million in 1968.* Although sales by the contractors to DOD have increased by only 28 percent between 1963 and 1968—$17,916,000,000 to $22,875,000,000—for those covered by the study, the amount of combined I.R. & D. and related costs reimbursed by the Government to these same contractors has increased by 49.2 percent—$459,000,000 to $685,000,000—a percentage increase almost double the percentage increase in sales to DO[D]. The problem has become especially acute in the past year. Although contractor sales to DOD increased by only 7.4 percent between 1967 and 1968, the amount of I.R. & D. and related costs reimbursed by the Government for the same period increased by 14.3 percent, a percentage increase almost twice the percentage increase in Government contract work. All of this in spite of the fact that the Government is already spending over $8 billion a year for regularly contracted research and development.

What this amounts to is that the public is being asked to support uncontrolled spending.

Contrary to the practices of the Atomic Energy Commission, the Pentagon does not know how much it will pay and does not control the amount it will pay for independent R. & D. *On occasion, advanced agreements with contractors are made by the service branches for future I.R. & D. in defense work. But this is the exception, not the rule.* The Government does not normally know even the programs for which it will end up paying the costs. In other words, the Department of Defense often does not even know what kind of programs or even the areas in which independent R. & D. money will be applied by the contractors. [Emphasis added.]

\*　\*　\*　\*　\*　\*

As I mentioned earlier, some contractors enter into advance agreements with the Government with respect to the projects for which I.R. & D. funds will be spent over the following year. *If we are to have an I.R. &*

D. program at all, advance agreements certainly give to the Government a degree of control over it that it does not presently have. Advance agreements at least give the Government an opportunity to decide whether proposed expenditures by a private contractor will in any way benefit the Government.

However, contractors have resisted even this modicum of government control. Many contractors have been unwilling to negotiate advance agreements. And in a case decided by the Armed Services Board of Contract Appeals on August 8, 1967— ASBCA No. 11931—it was ruled that where an advance agreement is not reached between the contractor and the Government, the Defense Department is still authorized to allow 100 percent of the contractor's I.R. & D. costs. Under the present policy, therefore, the contractor actually has an incentive not to enter into advance agreements.

*Even if advance agreements were entered into in every case, however, the major question surrounding the I.R. & D. program would not be answered. Why do we need to spend $685 million for an I.R. & D. program when we are already spending billions of dollars on R. & D. contracts?*

I believe this question needs to be asked and answered. From the study I have made, I can frankly see no justification for this program. If there is any justification for it, that fact needs to be demonstrated.

But even if the program is justified, it is not justified in its current, uncontrolled condition.

*I have felt for a long time that this program should not only be questioned but deleted,* but I have discussed this issue with the distinguished Senator from New Hampshire (Mr. McIntyre), who is the expert on the Armed Services Committee on R. & D. work, and with the distinguished chairman of the committee. *I have concluded, in view of the fact that this is an extraordinarily complicated area and there are very sincere and able people who contend that the program should continue, that a compromise would be more logical. For that*

reason I have agreed to an amendment which places a ceiling on I.R. & D. funds authorized to be spent in the current fiscal year in the amount of $468 million.

This will reduce the amount by about $117 million below what it otherwise would be.

*In addition, I intend to introduce further proposed legislation on this matter, and I have been informed that the Committee on Armed Services will hold hearings on it next year, and have been told that if I did this, I would be invited to appear as a witness for that bill.*

Mr. President, I reserve the remainder of my time.

MR. STENNIS. Mr. President, I think this is an important matter. It involves an item in the bill for a special kind of research that has been described by the Senator from Wisconsin. The sum for this year was $585 million. Last year it was $685 million. It varies according to the number of contracts we have, especially for weaponry.

In this connection, I do not like that word "compromise" too much; I simply could not agree to the Senator's original amendment, far reaching as it is, being adopted without hearings. So we agreed that the Senator would introduce the main part of his amendment as a bill, and the Committee on Armed Services would give full hearings on it, because it is something that ought to be developed with a better formula, a better understanding, and a better rationale. I do think, however, that there is great merit in some of this research.

We talked about reducing it somewhat this year, and we agreed on a 20-percent reduction, as the Senator stated; and his amendment, modified to carry that point only, will be supported by the members of the committee who have had a chance to look at it including the chairman.

Mr. President, I wish to yield some time to the Senator from New Hampshire, who has held some very important hearings for us on the subject of research and develop-

ment. I shall yield to the Senator from California (Mr. Cranston), later. I now yield 5 minutes to the Senator from New Hampshire.

MR. McINTYRE. Mr. President, I believe our colleague from Wisconsin has done the Senate a service in bringing up this amendment. It directs itself at business practices which are not well understood and yet are of a critical nature to the DOD overall mission. We need to understand these activities.

These are not carried as line items in the Defense Department budget but are part of the overhead costs of DOD contractors. This means that they are treated as part of the normal administrative costs of running a business, just like the contractor's accounting department or the salary of the company president. It is estimated that these expenditures are now running in the neighborhood of some $600 million a year.

As the chairman of the committee, the Senator from Mississippi (Mr. Stennis), has stated, no hearings have been held in the Senate directly related to this subject.

I am not suggesting, Mr. President, that because we have not had the chance to look at this in detail means that these activities are running slip-shod or out of hand. I think the record will show that they have been well managed to date and have made an enormous contribution to the Defense effort. This does not mean that their management cannot be improved—indeed the DOD jointly with NASA are currently working on an improvement in these areas.

I.R. & D. is that research and development function of Department of Defense contractors which is not directly tied to a specific contract, grant or other item of the budget or precise function of the Department, but consists of projects undertaken independently by contractors to increase their technical knowledge and capability and to develop products for future sales. The purpose of the I.R. & D. effort is to assure the continuation and growth of the company by improving the contractor's technical competitive position and giving him new products and technology of value to the Department of Defense.

So, with the concurrence of the Senator from Mississippi, *we have not only agreed with the Senator from Wisconsin* (Mr. Proxmire) on this 20-percent reduction, but also as chairman of the Subcommittee on Research and Development, I have assured the Senator from Wisconsin that we will commence hearings on his amendment, which, as I understand, will be introduced as a bill, before the end of this year; and next year when we come back, we will all have a better grasp of it and can work more intelligently on it. [Emphasis added.]

\*    \*    \*    \*    \*    \*

The foregoing remarks reflect the following as the essentials of Senator Proxmire's position on IR&D in 1969:

1.  That there was a serious question as to the justification for expending any military appropriations at all to subsidize IR&D in a year when some $8,000,000,000 was provided for contractually defined R & D work.

2.  That from 1963 to 1968 DOD reimbursements for IR&D had risen from $459,000,000 to $685,000,000, a percentage increase almost double that of the increase in DOD purchases of military hardware over the same period.

3.  That DOD was not exercising control over either the total amount of money that it was disbursing to reimburse contractor's IR&D costs or over the nature of the work for which those costs were being incurred.

4.  That the overall subject of IR&D and related activities was little understood by the Congress and was therefore in urgent need of further study as a preliminary to corrective legislation of a detailed nature.

5.  That in view of the Senate's commitment to examine the subject of IR&D in depth for the purpose of additional legislation to be considered in the next session of the Congress, the practical approach to the problem for purposes of the DOD's 1970 fiscal

year was a simple reduction of 20 percent in the amount of money that DOD proposed to disburse for reimbursement of IR&D and related costs during that year without attempting to legislate restrictions on the amount of reimbursement that an individual contractor could receive.

It is significant for present purposes that the matter of cost sharing by contractors performing IR&D apparently formed no part of the deliberations leading to adoption of Senator Proxmire's amendment providing simply for a dollar ceiling on DOD outlays for reimbursement of IR&D costs. Specifically, the potential value of an advance agreement, in the Senator's view had nothing to do with cost sharing. He viewed it as a means of forewarning DOD of the nature of research that a contractor expected it to subsidize, thereby enabling it to refuse in advance to pay for work that was not defense oriented.

The Senate unanimously adopted Senator Proxmire's $468,000,000 ceiling-type amendment. 115 Cong.Rec., Part 19, at 25601.

The House refused to accept the Proxmire amendment and the matter went to conference where it was ultimately compromised in the manner explained by the Conference Report, as follows (H.Conf.Rep.No. 91–607, 115 Cong.Rec., Part 24, at 32924):

SECTION 403. INDEPENDENT RESEARCH AND DEVELOPMENT

The Senate version contained a provision requiring that funds authorized by the Act shall not be available for the payment of independent research and development, bid and proposal, and other technical effort costs in the total amount in excess of $468,000,000. The provisions did not apply in the case of formally advertised contracts or to other firmly fixed price contracts competitively awarded.

This language was intended to provide a reduction of approximately 20% in the funds which would otherwise be expended for this purpose during Fiscal 1970. The House version contained no comparable language.

The conferees agreed on a compromise, which provides that contracts awarded subsequent to the effective date of this Act, costs incurred for independent research and development, bid and proposal and other technical effort shall not be in excess of 93% of the amount contemplated for such purposes in the 1970 Defense procurement and RDT&E program. This limitation shall not apply in the case of formally advertised contracts, other firmly fixed contracts competitively awarded, or contracts under $100,000. This limitation shall not apply to present contracts awarded prior to the effective date of this Act and shall not disturb independent research and development and other technical efforts already agreed upon.

It should be understood that the language of Section 403 applies to the Fiscal Year 1970 program only and is not to be considered a precedent for any future legislation. The Committee on Armed Services intends to study the matter of independent research and development and other technical effort and bid and proposal financing in detail during its review of defense authorization requests in the next session of Congress. The Senate conferees agreed with the House conferees that this matter is inadequately understood and that much greater knowledge must be gained in this area before determination is made as to any further legislative requirements.

Though not cast in terms of a specific dollar ceiling, as in the case of the Proxmire amendment, the conference version was directed to the same objective. Whereas the Proxmire amendment called for a 20-percent reduction in DOD proposed spending for IR&D, the compromise language provided for a 7 percent reduction. 115 Cong. Rec., Part 25, at 33381–82. Thus, section 403 of Pub.L.No.91–121, as enacted, provided as follows:

* * * Funds authorized for appropriation under the provisions of this Act shall not be available for payment of independent research and development, bid and proposal, and other technical ef-

fort costs incurred under contracts entered into subsequent to the effective date of this Act for any amount in excess of 93 per centum of the total amount contemplated for use for such purposes out of funds authorized for procurement and for research, development, test and evaluation. The foregoing limitation shall not apply in the case of (1) formally advertised contracts, (2) other firmly fixed contracts competitively awarded, or (3) contracts under $100,000.

In keeping with his previously declared intention, Senator Proxmire introduced additional legislation that was to serve as a major focal point for further evaluation of the IR&D problem during the next session of the Congress. On October 8, 1969, Senator Proxmire introduced S. 3003 (115 Cong. Rec., Part 21, at 29118). It provided:

A BILL To provide for more effective control over the expenditure of funds by the Department of Defense and the National Aeronautics and Space Administration for independent research and development, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 2301 of title 10, United States Code, is amended by adding at the end thereof the following:

"(4) 'Agency concerned' means the Department of Defense and the military departments thereof or the National Aeronautics and Space Administration."

Sec. 2. Chapter 137 of title 10, United States Code is amended by adding at the end thereof the following new sections:

"§ 2315. Research and development costs

"(a) No costs for research and development shall be allowable under any negotiated contract entered into by the agency concerned unless provision for such costs are specifically provided for in the contract; and no research and development costs shall be allowable under any such contract unless such costs provide a direct or indirect benefit to the work being performed under the contract.

"(b) Whenever funds are authorized under any negotiated contract for carry out one or more independent research and development projects, the contractors or subcontractor shall be required to submit to the agency concerned a technical appraisal of each such project. A technical appraisal submitted pursuant to this subsection shall be prepared in accordance with regulations issued by the agency concerned.

"(c) Any research and development costs determined not to be of direct or indirect benefit to the work being performed under the contract may not be allowed as an overhead expense under the contract.

"(d) As used in this section the term 'research and development' includes (1) either research or development, or both, and (2) any other work or service generally identified or classified as 'other technical effort'.

"§ 2316. Bid and proposal expenses

"The cost of preparing bids or proposals, successful or unsuccessful, shall be an allowable expense of a contractor or subcontractor under any negotiated contract if the subject matter of the bids and proposals is applicable to the program of the agency concerned. The cost of preparing bids or proposals shall be allocated only as indirect costs of the contractor or subcontractor. In no case may the amount allowed for bid and proposal expenses under any negotiated contract (1) exceed 1 per centum of the direct material (exclusive of capital equipment) and the direct labor costs of the contract performed or to be performed, or (2) include negotiating or promotional expenses, expenses properly allocable to research and development, or the expense of salesmen, representatives, or agents who do not provide technical services in connection with the bid or proposal."

Sec. 3. The table of sections at the beginning of chapter 137 of title 10, United States Code, is amended by adding at the end thereof the following:

"2315. Research and development costs.
"2316. Bid and proposal expenses."

Sec. 4. The amendments made by this Act shall be effective with respect to contracts entered into on and after the date of enactment of this Act.

Presumably the above proposal embodied all of the curbs that the Senator deemed necessary and appropriate to eliminate the waste and inefficiency that he perceived in IR&D programs as theretofore administered by DOD. Notably, for present purposes, that proposal concentrated entirely on insuring that all IR&D work to be paid for by the Government was specifically authorized in advance and clearly identified as having a subject-matter relationship to the procurement contract against which the cost of the IR&D work would be charged. In short, Senator Proxmire's concern was apparently with simply insuring that the Government receive the benefit of the IR&D work that it paid for. There is nothing to suggest that, as in cost sharing, he expected or wanted the contractor to absorb any part of his cost of doing IR&D work that was properly allocable to Government procurement contracts.

On February 16, 1970, the Comptroller General issued Report B–164912 "Allowances For Independent Research and Development Costs in Negotiated Contracts—Issues and Alternatives."

Both the Senate and House Armed Services Committees commissioned specially constituted subcommittees, for the Senate an Ad Hoc Subcommittee on Research and Development, and for the House an Independent Research and Development Subcommittee, to thoroughly examine the entire matter of IR&D programs with particular emphasis on their nature and the extent to which and the means by which DOD had been bearing the cost of such programs. Each of these subcommittees held hearings: House Hearings on Independent Research and Development; Before the Armed Services Investigating Subcommittee of the Committee on Armed Services under the authority of H.R.Res.105, 91st Cong., 2d Sess. (1970): Part 3, Senate Hearings on Department of Defense Funding of Contractor's Independent Technical Efforts; Before the Ad Hoc Research and Development Subcommittee of the Committee on Armed Services, 91st Cong., 2d Sess. (1970).

The Comptroller General testified at length before both the House and Senate subcommittees in that order. House Hearings, *supra* at 2–38; Senate Hearings, *supra* at 1875–1919, 2493–2610.

For present purposes the chief significance of the Comptroller General's testimony and the GAO report is that both explicitly advised the Congress that cost sharing was then a typical feature of those advance agreements that the procurement authorities were able to obtain from contractors; that contractors were generally opposed to cost sharing, as were those in some quarters of DOD; and that 1968 proposed revisions to ASPR would no longer provide for cost sharing. House Hearings, *supra* at 4–5; Senate Hearings, *supra* at 1877–78, 2547–53. The GAO report was noncommittal on the merits of cost sharing. It neither approved nor disapproved of its continued use. Senate Hearings, *supra* at 2580–83. Finally, GAO's recommendations to the Congress for improvement in the operation of IR&D funding programs included nothing pertaining directly or indirectly to cost sharing. In testimony before the House Committee the Comptroller General summarized GAO's findings and recommendations as follows (House Hearings, *supra* at 15–16):

The cost to the Government for DOD and NASA participation in I.R. & D. programs has been rising continuously. These hearings and the coming hearings in the Senate are therefore very timely, particularly in view of the fact that the appropriations for 1970 for R. & D. in DOD and NASA are being reduced.

We believe that it is important that industry maintain its capability to develop new systems for national security. But considering the fact that $16 billion is being spent by the Government for direct R. & D. (half by DOD), the question inevitably arises as to whether the additional cost to the Government of $800

million per year for sharing I.R. & D. and related expense is of comparable value to the Government. If so, the question naturally arises as to whether these programs should not be handled under contracts or at least be required to be relevant to the contract or the agency's direct interest.

We recognize that some differences between agencies in participation in I.R. & D. and related costs may be necessary. Nevertheless, it seems clear that some consistent policy calling for a greater relationship between the extent of participation and the benefits to be realized would be of advantage to the Government as a whole.

Accordingly, we have included in our report certain recommendations to the Congress, summarized in the digest in the report, as follows:

1. No clear distinction can be made between I.R. & D. and other independent technical efforts, such as bid and proposal efforts; and consequently, any agreed ceilings on I.R. & D. negotiated by DOD or NASA can be avoided through description of an I.R. & D. project under different terminology. We recommend that all contractors' independent technical efforts, including I.R. & D., bid and proposal, and other technical efforts be considered as a single entity.

2. Unlike AEC and NASA, DOD has separate appropriations for procurement and for R. & D. activities, and DOD's share of contractors' I.R. & D. costs generally is borne by the procurement appropriation without identification as I.R. & D. We recommend that, if the Congress authorizes continuation of the present practice of allowing the inclusion of I.R. & D. as an acceptable cost element in negotiated contracts, DOD be directed to break out and identify separately in its appropriation requests the amount estimated as required for this purpose.

3. The policies followed by DOD and NASA on acceptability of I.R. & D. costs differ from those of AEC which allows I.R. & D. costs as an element of overhead only to the extent that they provide a direct or indirect benefit to the contract work. We recommend that a policy be established by the Congress stating the extent to which, and under what circumstances, Government agencies should participate in the cost of contractors' independent technical efforts.

Our report also presents several issues and alternatives for consideration in determining the Government-wide policy on I.R. & D., as follows:

Whether or not the present practice of allowing I.R. & D. as an acceptable overhead cost in negotiated contracts should be replaced by a system of:

(a) Extending the use of direct R. & D. contracts to include those I.R. & D. projects which the agency wishes to support fully or on a cost-sharing basis, thereby providing greater assurance that the desired work will be performed and that the Government will be entitled to information and royal-free rights to any inventions arising therefrom, and

(b) Authorizing an allowance for a stipulated percentage of the remainder of the contractor's total I.R. & D. effort, irrespective of the source of funding, either as a profit factor or through acceptance as a recognized overhead cost, as an incentive to contractors to continue technical efforts beyond those directly contracted with the Government:

Whether or not allowances to contractors for I.R. & D. should be confined to projects that have a direct and apparent relationship to a specific function of the agency, and

Whether or not, if I.R. & D. allowances by DOD and NASA are continued on the present basis and are not related directly to current or prospective Government procedure, financial support should be provided to companies with similar capabilities which do not hold Government contracts as a means of supporting and strengthening industrial technology.

We include this point because the statement has been made from time to time that the Government is increasing the technology base of American industry,

and therefore I.R. & D. indirectly will benefit the Government when it enters in the market for competition. The point here suggested is that that competition ought to exist in the entire industrial sector, not just to those who have Government contracts at a particular point of time.

\*　　\*　　\*　　\*　　\*　　\*

The principal witness who appeared before both subcommittees on behalf of DOD was Dr. John S. Foster, Jr., that agency's Director of Defense Research and Engineering. House Hearings, *supra* at 251–73; Senate Hearings, *supra* at 1949–2002. The burden of his testimony in each instance was the same. Although acknowledging the need for improvement in the effectiveness of DOD's funding of IR&D, Dr. Foster opposed as impracticable the principal provisions of S.3003, limiting reimbursable IR&D to that specifically authorized by and directly related to an existing procurement contract. He presented DOD's position on IR&D reform, as follows (House Hearings, *supra* at 267–68):

> \* \* \* we have concluded that the type of dollar and technical control and review that will in the long run best satisfy the concerns of the Congress and the GAO and provide the most satisfactory solution to the many complex problems inherent in I.R. & D., and bid and proposal can be achieved within the existing DOD administrative framework; and that, therefore, further legislation is not necessary. In fact, such legislation could be detrimental to both the Government and industry and therefore would not be in the best interests of the Nation; it could result in more effort that might be of less benefit.

> We have just completed a full review of this whole area in detail. We have looked at changes which could increase our control of I.R. & D., and bid and proposal without removing or unduly restricting the features of flexibility and inventiveness upon which the system depends for its value. We have selected a plan approved by the Deputy Secretary of Defense, David Packard, which makes use of both negotiated advance agreements and the DOD-developed formula. We feel these will satisfy congressional concerns and our own, while keeping alive the vital independent nature of this work. The five elements of this approach are set forth below:

> 1. Use individually negotiated advance agreements for the control and reimbursement of these costs for approximately 100 of the larger defense contractors. This will require that we increase the number of contractors with which we negotiated advance agreements by a factor of almost two. Such agreements, after a formalized detailed technical review of the proposed I.R. & D. program, will establish a separate dollar ceiling for the DOD's reimbursement of each of these costs but will allow the contractor to combine the individual amounts into a single pool if he chooses. We will require the contractor to burden these costs as he would for a contract, except that G. & A. would not be added. The requirement to negotiate an advance agreement will be enforced by automatically establishing a low threshold for recovery of these costs where no advance agreement exists.

> 2. Strengthen technical review and evaluation of contractors' I.R. & D. programs, as currently established under DOD instruction 4105.52. Establish uniform review and evaluation procedures to be used throughout the DOD. The system will require the review of a company's individual I.R. & D. projects as submitted at the time of the advance agreement.

> 3. A data bank will be established to provide a centralized body of I.R. & D. project cost and technical information. This information will be available to the Government technical community at large.

> \*　　\*　　\*　　\*　　\*　　\*

> 4. Use the DOD-developed formula for control and determination of its reasonableness of these costs for the remaining large number of smaller companies

who recover I.R. & D. and B. & P. costs. This will provide a workable system that can be uniformly applied—one which will assure results that can be easily monitored and adjusted as needed.

5. The military departments will increase, as necessary, the support and resources needed to effectively perform the required I.R. & D. technical reviews and evaluations.

\* \* \* \* \* \*

From the above it is seen that cost sharing was not among the measures that DOD proposed to employ as a part of its efforts to improve the administration of IR&D programs, that omission being consistent with its earlier proposed revision of ASPR to delete endorsement of cost sharing.

On September 18, 1970, the House subcommittee issued a report on its investigation. That report concluded as follows (Report of Subcommittee of the House Committee on Armed Services, 91st Cong., 2d Sess., on Review of Independent Research and Development Program Management, at 13–15):

### SUMMARY OF FINDINGS AND CONCLUSIONS

1. Every progressive industrial concern, in one way or another, incurs expenses generated by the necessity to continue to improve its technical capabilities and, in turn, its products or services. This is generally accomplished through the firm's research and development programs. The costs of these essential research and development programs are therefore an accepted cost of doing business, and are recoverable in prices charged to customers—commercial and Government alike.

2. Department of Defense regulations provide that a contractor may be reimbursed for those IR&D costs included in the prices of defense contracts which the contracting officer determines are reasonable.

3. IR&D efforts are generally encouraged by the Government because:

(a) Company-sponsored research and development creates a vast reservoir of technical capability that is immediately available for defense needs.

(b) They promote greater competition by fostering the availability of alternative products and prices to satisfy defense requirements.

(c) They pave the way for technical progress which could not be achieved by the Department of Defense or Department of Defense-sponsored efforts alone.

4. Because of the millions of Department of Defense procurement actions each year and the thousands of contractors and subcontractors involved, there are practical limitations on determining the precise cost of IR&D included in every purchase.

5. Although specific products arising from IR&D can be identified as beneficial to defense efforts, other benefits, such as the creation of competition and maintenance of a widespread technological base, cannot be measured in terms of dollars.

6. Basic research, an element of IR&D, may not have a direct or apparent relationship to immediate Department of Defense needs or operations. However, it is as necessary to the future needs of the Department of Defense and the nation as it is to the future of private business.

7. When Department of Defense procurements are competitively awarded, effective price competition is deemed sufficient to assure the reasonableness of IR&D costs contained in contract prices. When competition is not present, the Department of Defense is obligated to exercise greater surveillance by detailed examinations of IR&D programs to assure that no more than an equitable share is reimbursed by the agency.

8. In 1969 the Department of Defense examined in detail IR&D costs incurred by the larger defense contractors whose defense sales totaled $22.4 billion, approximately half of DOD's purchasing that year. Of the $802 million incurred by these contractors for IR&D, the Department of Defense reimbursed the contractor $393 million.

9. The Department of Defense regularly negotiates advance agreements to support IR&D programs of about 50 major contractors. In the year 1969 this group incurred $643 million for IR&D expenditures and were reimbursed $320 million by Department of Defense payments.

10. *Although the Armed Services Procurement Regulation recognizes that the Government should pay its fair share of Department of Defense-oriented IR&D, it states that in certain cases it may be desirable to pay less than its fair share to create "motivation" for efficiency. The latter has become the standard operating procedure. It is achieved by what is known as a negotiated "advance agreement".* [Emphasis added.]

11. The Department of Defense has encountered increasing contractor reluctance to accept Department of Defense demands for cost sharing and ceilings in advance agreements.

12. In its two-year study of the Department of Defense's management and control of IR&D, the General Accounting Office found a lack of uniformity among the services in the treatment of IR&D allowances.

13. It is the opinion of the Subcommittee that present weaknesses in Department of Defense procedures and practices relating to IR&D can be rectified administratively. The Comptroller General concurs in this view.

14. The implementation of Section 403, PL 91–121, dated November 19, 1969, will probably result in increased costs of Department of Defense administration and contractor record keeping for five to seven years in the future and net savings are doubtful.

15. The Department of Defense has adopted the following new procedures designed to improve the management of IR&D:

(a) The use of negotiated advance agreements for the control and reimbursements of IR&D costs will be expanded to all of the major defense contractors on a basis which will encourage participation of contractors.

(b) The policy of expediting the negotiation of advance agreements will be encouraged by reducing recovery of these costs where no advance agreement exists.

(c) Technical reviews and evaluations of contractors' IR&D programs will be strengthened, and uniform procedures will be promulgated to assure that Government interests are protected.

(d) With respect to the large number of small defense contractors not subject to negotiation of advance agreements, the Department of Defense will develop appropriate formulas for the control and determination of reasonableness of IR&D costs reimbursed under defense contracts.

(e) A data bank will be established to provide a centralized body of IR&D technical information for use in the Department of Defense's overall planning of its Research and Development program. This information will be made available to the Government technical community at large.

(f) The Department of Defense will increase as necessary the support and resources to effectively perform the required IR&D technical reviews and evaluations and approval of reimbursements of IR&D costs.

## RECOMMENDATIONS

The Subcommittee recommends:

1. That control of defense expenditures for IR&D, B&P and OTE be achieved through improved Department of Defense administration, coupled with adequate oversight, rather than through legislated ceilings.

2. That Section 403, PL 91–121, dated November 19, 1969, be repealed.

3. That the Department of Defense

(a) Segregate the costs of B&P and OTE in the negotiations of advance agreements for IR&D;

(b) *expand the use of advance agreements* to include all firms receiving $2 million or more annually from the Department of Defense as partial reimbursement for IR&D expenditures, *pro-*

*vided the use of cost sharing arrangements be eliminated;* [Emphasis added.]

(c) provide appropriate right to appeal where, in the absence of an advance agreement, the Department of Defense establishes a recovery of costs which a contractor claims is less than the amount of its fair share;

(d) develop uniform regulations which will provide clear guidance to all services as to policies, practices and procedures to be followed in the establishment of allowable IR&D costs and the negotiation of IR&D advance agreements; and

(e) provide the appropriate Congressional committees with annual reports of the IR&D payments made to major contractors during the past fiscal year.

4. Although basic research conducted as IR&D is vital to DOD and national interest, it cannot be always directly related to a DOD operation or function. Therefore, the Subcommittee recommends that the criteria of relevancy not be used as a determining factor in the support of *basic research* efforts of contractors.

Senator Proxmire testified in support of S. 3003 before the Senate subcommittee. 3 Senate Hearings, *supra* at 1641–75. The following colloquy between Senators Symington and Proxmire clearly demonstrates that despite his extreme dissatisfaction with DOD's performance in the administration of funding for IR&D, Senator Proxmire had no desire to require a contractor to absorb, as in cost sharing, any part of IR&D cost that was properly allocable to Government procurement (3 Senate Hearings, *supra* at 1663–65):

SENATOR McINTYRE. Senator Symington?

SENATOR SYMINGTON. Mr. Chairman, I am not a regular member of the subcommittee, and I yield if it meets with the Chair's approval to my distinguished colleague from Massachusetts, and then perhaps you would allow me to make a couple of comments and ask a couple of questions.

SENATOR BROOKE. Mr. Chairman, I will be pleased to yield to the Senator.

SENATOR SYMINGTON. You are very kind.

### TRUE PRODUCT COST

First, Senator, I want you to know that I am very much impressed with your statement. I think it is thought-provoking, and although at times I think it is a little harsh, I think it is a constructive statement.

The question of cost is always a difficult matter to decide. There was a time in my life when I was selling Sears, Roebuck over a period of years on a cost-plus basis, and I had to meet all outside competition under the contract, which ran into millions of dollars a year, and therefore it was very difficult to sell them on what was or was not cost as against the opinion of the buyer, so I think I have had as much experience on what is cost as any Senator.

Then later in my life I worked for the Army and the Army Air Corps and the Navy, and the question would come up what part of the plant was or was not working for one of the three services, and all the various cost departments of the three services or at least in effect the Army Air Corps by that time was a service would disagree and the matter would ultimately be decided by the General Accounting Office.

So I think that your paper is most constructive.

*As I understand it, what you are trying to do is to establish what is true cost. Am I correct on that?*

SENATOR PROXMIRE. *That is correct.*

SENATOR SYMINGTON. What is the true cost of a product, and that you believe that the cost of the product and the cost of the research incident to the product in the same or comparable contracts can be made without in effect having an overall research contract that can be applied at will by the contractor without the proper check. Is that correct?

SENATOR PROXMIRE. That is right. Without the proper check, without the

proper knowledge, without requiring—it seems to me that it is most important that the Congress at least know what we are doing, know what we are funding, and not have this vague, amorphous kind of thing in which the contractor does whatever he wants to do.

SENATOR SYMINGTON. In previous contracts which you have criticized in the Joint Economic Committee of which I have the privilege of being a member, I must say at first that I thought you were wrong, but the proof that you were right lies in the fact that in recent contracts that have been given out, there have been major changes in the contracts to adjust the problems that you brought up at that committee.

In [t]his case, with the superb work that was done last year by the chairman of this subcommittee, I am confident that before these hearings are over we will have a better understanding of what is true cost. I am also confident that Secretary Laird and Secretary Packard, who together are probably the best and most experienced team we have ever had in this position, will fully support anything that is brought up by this subcommittee to find out what is the true cost of a product.

For that reason I look forward to reading these hearings carefully, and forming my own opinion on it to present that opinion to my friend, the able and constructive chairman of the subcommittee, and to discuss it further on the floor.

Mr. Chairman, I appreciate the Senator from Massachusetts yielding to me, I have to go up to another hearing, and therefor I especially appreciate it, and I want to thank you for your courtesy in letting me appear this morning.

SENATOR PROXMIRE. If the Senator from Missouri will just yield for a quick response let me say what he has said is exactly, he said it much more concisely and better, but exactly what I am trying to get at.

*What I favor is the Federal Government paying for the true cost, and if accountants or other experts can show that something that is not now included or thought of as a cost should be I am all for it.*

SENATOR SYMINGTON. *Paying for the true cost* plus a fair profit under our system.

SENATOR PROXMIRE. *Exactly,* yes indeed, a fair profit of course. I think that is right and that should be added, but I think *it is clear to me that at the present time we are not expending this independent R.D.T. & E., independent, for anything that the Federal Government really gets, at least we get very little of it,* and that there are much better ways of doing this.

SENATOR SYMINGTON: Thank you. [Emphasis added.]

\*    \*    \*    \*    \*    \*

Unlike its House counterpart, the Senate subcommittee issued no report at the conclusion of its deliberations on IR&D.

In summary, the record of proceedings before the two subcommittees clearly reflects that at that juncture cost sharing was not regarded by anyone concerned as a device that ought to be a part of the effort to improve the ground rules governing DOD's financial participation in future IR&D programs. The subcommittee membership was made expressly aware both that cost sharing had been extensively used in such advance agreements as DOD had been able to obtain in the past and that the agency had issued proposed revisions to ASPR that would no longer permit such use. GAO, fully mindful of both of these considerations, did not endorse cost sharing as a useful element of the reform program that it proposed. DOD opposed any statutory constraints on IR&D funding, urging that all needful controls could be implemented administratively. Cost sharing was not among the panoply of control measures that it proposed to that end. Predictably, industry spokesmen were uniformly opposed to cost sharing. The House subcommittee, endorsing DOD's position that corrective legislation was neither necessary nor appropriate, expressly conditioned its approval of mandatory advance agreements for large contractors on the proviso that " \*    \*    \*

the use of cost-sharing agreements be eliminated." Report of House subcommittee, *supra* at 15. Most significantly of all, Senator Proxmire, the harshest critic of DOD's then current IR&D practices and the foremost advocate of the need for remedial legislation, specifically disclaimed the sole objective that cost sharing is designed to achieve; the enforced absorption by a contractor of a portion of IR&D cost that on the merits is allocable to defense contract work.

The question thus becomes that of determining whether the essentially unanimous sentiment on cost sharing, as indicated above, underwent any discernible change in the subsequent course of adoption of H.R. 17123, 91st Cong., 2d Sess., the bill that evolved into Pub.L.No.91–441.[2]

On April 24, 1970,[3] the House Armed Services Committee issued its report on H.R.17123, H.R.Rep.No.91–1022, 91st Cong., 2d Sess. On the subject of IR&D the report stated as follows (at 43):

> Independent Research and Development (IR&D) is generally defined as that part of a contractor's total research and development effort which is not performed pursuant to a direct grant or similar agreement. In view of the substantial cost of such efforts in prices charged DOD by major defense contractors, the Armed Services Committee initiated a comprehensive review of Defense Department support of IR&D to determine the reasonableness of charge and adequacy of agency control of contractor programs.
>
> Accordingly, the Armed Services Investigating Subcommittee held hearings as part of an extensive study of this type of advanced research.
>
> The Subcommittee has reported to the Committee at this time that no evidence has surfaced which supports a conclusion that significant waste or inefficiency exists in the conduct of independent research and development. The Subcommittee stated that a Congressional fund-

ing limitation on the support of IR&D activities in the contractors' plants is unwarranted at this time and would unnecessarily impair the overall R&D activities in the Department of Defense.

> The Subcommittee has identified, administrative inconsistencies in the supervision of such programs. It is continuing its in-depth analysis of this complex procurement area and expects to file a comprehensive report later in this session of Congress.

As consonant with the views expressed in the report of the Armed Services Committee, H.R.17123, as it passed the House on May 6, 1970,[4] contained no new provisions dealing with IR&D.

On July 14, 1970, the Senate Armed Services Committee issued its report on H.R. 17123, S.Rep.No.91–1016, 91st Cong., 2d Sess. Concerning IR&D, the report said (at 96–99):

## SECTION 203—DEPARTMENT OF DEFENSE FUNDING OF CONTRACTORS' INDEPENDENT TECHNICAL EFFORT

*Background*

The fiscal year 1970 Military Procurement Authorization Act, Section 403, established a limitation which provided that payments for independent research and development, bid and proposal, and other technical effort costs to contractors would not exceed 93 percent of the total amount contemplated for such purpose. This was an interim provision. It was agreed that the Committee would investigate the issue in depth in its consideration of the fiscal year 1971 authorization request.

The term IR&D, as commonly used, but more properly referred to as contractor independent technical effort includes three elements. These are independent research and development (IR&D), bid and proposal (B&P) and other technical effort (OTE). IR&D as one of these elements, is generally

---

**2.** Note 1, *supra*.

**3.** 116 Cong.Rec., Part 10, at 13077.

**4.** 116 Cong.Rec., Part 11, at 14492.

defined as that part of a contractor's total research and development program which is not performed under a specific contract, grant or similar agreement, and which is undertaken in areas at the discretion of the contractor. Bid and proposal represents costs incurred by contractors in the preparation of bids or proposals to the Department of Defense for new weapons systems or components. The difference between B&P and IR&D lies in the purpose for which the work is done. If it is done without the intent of including the results in a specific proposal, but has the more general aim of developing processes, products, or service capability, it is called IR&D. Other technical effort (OTE) encompasses a group of miscellaneous technical activities performed by contractors which is not identified either as IR&D or B&P. It is a hybrid classification which has grown up as an accounting convenience. The Department of Defense has proposed the elimination of this classification and the inclusion of such items under either the IR&D or the B&P categories.

## Alternatives

The Committee's Ad Hoc Subcommittee on Research and Development held extensive hearings during which the Department of Defense, General Accounting Office, Atomic Energy Commission and four industry associations testified. Senators Proxmire and Cranston also appeared before the Subcommittee.

The Subcommittee was faced with three alternatives:

1. Recommend that no legislation be enacted so that Congress would continue to exercise no control over these payments.

2. Recommend adoption of S. 3003, which would be very limiting both as to the amounts and purposes which would qualify under this proposal.

3. Recommend a new provision which would provide a reasonable and feasible measure of control by the Congress, and which would not unduly burden the Department of Defense and industry with cumbersome and costly procedures.

## Recommendation

The Committee's proposed amendment reflects the selection of the third alternative and *has four main features*:

(1) It would require the Defense Department to negotiate advance agreements with all contractors who, during their preceding fiscal year, received IR&D, B&P, and OTE payments in excess of $2,000,000.

The number of contractors covered by this provision would be approximately 50, the same approximate number with whom advance agreements are presently signed. Accordingly, there would be no major expansion of the number of individual negotiations in which the Department would have to engage.

These agreements, however, would have to cover not only the IR&D programs of these contractors, but their B&P and OTE programs as well. The Defense Department has acknowledged that an expanded ceiling of this kind is needed if a solution is to be found to the present practice whereby companies subvert their IR&D ceilings by classifying certain expenditures in the B&P and OTE accounts.

While only 50 or so companies will be covered by this $2 million threshold, these companies account for the great bulk of all auditable independent technical effort funds disbursed by the Department, which amounted to 93.1% in 1968 and 95.6% in 1969.

(2) It would require that the IR&D portions of these advance agreements be accompanied by technical evaluations of contractors' proposed IR&D programs. These evaluations must be improved if the Department is to be assured that the work done is of great potential value to its future needs.

(3) It would require that no payments be made for IR&D, B&P, and OTE work not relevant to the functions and operations of the Department of Defense. This provision should serve as a directive to the Department to avoid a recurrence of the isolated

past instances in which Department funds have been used to fund the research of contractors on commercial products.

(4) It would establish a ceiling of $625,000,000 on the payments to be made pursuant to the advance agreements required to be negotiated during fiscal year 1971.

The Department of Defense opposes the establishment of such a ceiling. However, the Committee is convinced that a ceiling is essential if the Congress is to be assured that costs in this area do not continue to rise at an unacceptable rate, and to provide the basis for an annual review of this program.

It has given considerable attention to the alternative types of ceilings it could establish and has rejected both line item control and a ceiling based on a given year's funds as administratively unworkable. The approach actually chosen will require the Department to do nothing more than to divide the $625,000,000 available to it among the 50-odd companies with which agreements are required.

The Military Departments have provided the Committee with estimates indicating projected total payments for contractor independent technical effort programs of $656 million for the year 1970 and $645 million for the year 1971, compared with the $759 million reported for 1969. Although these amounts are recognized as estimates, their downward trend is consistent with the ceiling of $625 million recommended by the Committee. Indeed, since the $625 million ceiling covers only those large companies who may be expected to receive about 95% of the total payments made, the ceiling actually affords the Department leeway to exceed its present estimates.

*Consideration of S.3003*

A primary purpose of the Committee hearings was the evaluation of S. 3003. The Committee recommends against enactment of S. 3003 because in its view this bill would produce a series of adverse effects on both the Defense Department programs and defense industry which would far outweigh any of its benefits. S.3003 would prohibit the reimbursement of a company for its IR&D and OTE costs unless such costs were specifically provided for in a given contract. In such event, the contractor in question would have to submit to the Defense Department a technical appraisal of each IR&D project covered, and reimbursement would not be allowed unless the work at issue was of direct or indirect benefit to the work being performed under the contract.

S. 3003 also would restrict reimbursement for B&P costs by providing a ceiling of one percent of the direct material and direct labor cost of the contract under which these reimbursements would be made.

The provisions of S.3003 relating to IR&D and OTE would eliminate much of the contractor independence which is so important because it permits contractors a wide degree of latitude in pursuing promising goals. The overall effect of a system under which all IR&D projects had to be contracted for specifically would be the elimination of IR&D as it is presently known and the substitution of direct contracting as a universal policy.

This would result in significantly higher administrative costs for the Defense Department as well as a marked decrease in the amount of research work performed by defense industry. Such a decrease would inevitably occur because of the stringency of an elaborate administrative system. The flexibility which contractors presently enjoy in the process of trial and error necessary to the solution of technical problems would be lost.

The proposed limitation on B&P reimbursement as a percentage of direct material and labor costs is not meaningful because such expense has no direct relationship to these costs. It is related to the contractor's backlog of work and the magnitude and complexity of the equipment on which he quotes. As a result, B&P expenses fluctuate considerably between contractors and for individual contractors from year to year. A common formula as proposed by S.3003, therefore, is not meaningful.

While the Committee is convinced, as a result of its hearings, that enactment of S. 3003 is not advisable, it is also convinced that Defense Department administration can be significantly improved and the costs of these programs reduced. The Committee was disturbed by recent increases in the total spending by the Defense Department for this program. Between 1963 and 1969 the amount increased from $459 million to $759 million, a rate of growth significantly greater than the rate of growth in the Defense Department procurement budget.

*Department of Defense Plan*

The Department of Defense proposed the following 5 point plan as a means of overcoming these problems.

(1) The improved use of individually negotiated advance agreements for the control and reimbursement of these costs for approximately 100 of the largest defense contractors.

(2) A strengthening of the Department's technical review and evaluation procedures in this area.

(3) Establishment of a data bank to provide a centralized body of IR&D project cost and technical information.

(4) The use of a standard formula in determining the reimbursable costs of the large number of small contractors whose volume of sales to the Department does not justify the negotiation of advance agreements.

(5) An increase in the resources of the military departments such as is necessary to permit implementation of the first four points.

*Conclusion*

*The Committee* supports the Department in its efforts to improve its administration in this complex area, and *urges strongly that immediate steps be taken to implement the above plan,* consistent with the amendment proposed by the Committee. The Committee *believes also,* however, *that the importance of* contractor *independent technical effort programs to our security, and the amount of money used annually to fund them, both justify broad legislative controls by the Congress in this area.* [Emphasis added.]

While the Senate Committee favored prompt implementation of the administrative measures proposed by DOD in lieu of legislation, it did not regard those measures as sufficient in themselves. Rather, it felt that they required fortification by the imposition of "broad legislative controls" which it identified as four in number, *viz,* mandatory advance agreements for previous recipients of large IR&D reimbursements; thorough technical scrutiny by DOD of contractors' IR&D proposals; an outright prohibition of reimbursement for IR&D not demonstrably relevant to the functions or operations of DOD, an absolute annual ceiling on the amount of IR&D payments that DOD could make pursuant to advance agreements. Significantly, neither the DOD-proposed administrative measures nor the legislative controls embraced the principle of cost sharing.

To accomplish the above objectives the Committee referred H.R.17123 to the full Senate on July 23, 1970, with the following provision concerning IR&D (116 Cong.Rec., Part 19, at 22591):

Sec. 203. (a) Funds authorized for appropriation to the Department of Defense under the provisions of this Act or any other Act shall not be available for payment of independent research and development, bid and proposal, or other technical effort costs *unless the work for which payment is made is relevant to the functions or operations of the Department of Defense and unless* the following conditions are met—

(1) the Secretary of Defense, prior to or during each fiscal year, negotiates advance agreements establishing a dollar ceiling on such costs with all companies which during their last preceding fiscal year received more tha[n] $2,000,000 of independent research and development, bid and proposal, or other technical effort payments from the Department of Defense, the advance agreements thus nego-

tiated (A) to cover the first fiscal year of each such company beginning on or after the beginning of each fiscal year of the Federal Government and (B) to be concluded either directly with each such company or with those product divisions of each such company which contract directly with the Department of Defense and themselves received more than $250,000 of such payments during their company's last preceding fiscal year;

(2) the independent research and development portions of the advance agreements thus negotiated are based on company submitted plans on each of which a technical evaluation is performed by the Department of Defense prior to or during the fiscal year covered by such advance agreement;

(3) no payments for independent research and development, bid and proposal, and other technical effort costs are made by the Department of Defense to any company or product division with which an advance agreement is required by subsection (a)(1) of this section, except pursuant to the terms of that agreement; and

(4) *the total dollar value of the advance agreements* negotiated prior to or during a given fiscal year as required under subsection (a)(1) of this section *does not exceed a ceiling to be established annually by the Congress.*

(b) In the event negotiations are held with any company or product division with which they are required under subsection (a)(1) of this section, but no agreement is reached with any such company or product division—

(1) no payments for independent research and development, bid and proposal, and other technical effort costs shall be made to any such company or product division during the fiscal year for which an agreement was not reached, except in an amount substantially less than the amount which, in the opinion of the Department of Defense, such company or product division would otherwise have been entitled to receive; and

(2) the amount of money received by that company for independent research and development, bid and proposal, and other technical effort costs during its last preceding fiscal year shall be included in determining compliance by the Department of Defense with the ceiling established by Congress, pursuant to subsection (a)(4) of this section, for the fiscal year in question.

(c) The Secretary of Defense shall submit an annual report to the Congress on or before January 31, 1972, and on or before January 31 of each succeeding year, setting forth—

(1) those companies with which negotiations were held pursuant to subsection (a)(1) of this section prior to or during the preceding fiscal year, together with the result of those negotiations;

(2) the manner of his compliance with the ceiling established by Congress for the preceding fiscal year pursuant to subsection (a)(4) of this section; and

(3) the latest available Defense Contract Audit Agency statistics on the independent research and development, bid and proposal, and other technical effort payments made to major defense contractors whether or not covered by subsection (a)(1) of this section.

(d) The provisions of this section shall apply only to contracts for which the submission and certification of cost or pricing data are required in accordance with section 2306(f) of title 10, United States Code.

(e) The ceiling to be established pursuant to subsection (a)(4) of this section for fiscal year ending June 30, 1971, shall be $625,000,000.

(f) Section 403 of Public Law 91–121 (80 [83] Stat. 204) is hereby repealed. [Emphasis added.]

That cost sharing formed no part of the Senate's approach to controlling DOD's expenditures for IR&D is evidenced by that body's debate on H.R.17123, as amended by its Armed Services Committee. At the outset, Senator Proxmire identified the basic flaws that he sought to correct (116 Cong. Rec., Part 19, at 25762):

MR. McINTYRE. * * * I think what we all realize on the subcommittee is that we must maintain our technological base and do it in a most efficient manner.

MR. PROXMIRE. I agree with that wholeheartedly.

I would like to make one other point with the Senator from New Hampshire. This refers to independent research and development. As the Senator knows, I offered an amendment last year, which was accepted in part, very graciously, by the Senator from Mississippi (Mr. Stennis) and the Armed Services Committee, and it was held in conference. Senator Stennis suggested I introduce a bill, on which hearings could be held. As the Senator has stated, it is enormously important—$625 million is involved. I understand 95 percent goes to 50 companies, or an average of $12 million to a company.

Of course, it is very lucrative and highly profitable to have thousands of dollars for independent research and development. *There is no line item; the accountability has been vague in the past.* I am delighted that *the Senator, as I understand it, has made this an identifiable item and put a ceiling on it*—A ceiling which, as I understand, is below the ceiling we have had heretofore. So I think this is a very commendable improvement over our past operations, and I think the Senator from Mississippi (Mr. Stennis), the Senator from New Hampshire (Mr. McIntyre) and other members of the committee, but especially Senator McIntyre, who is responsible in this area, deserve a great deal of credit and the thanks of the Senate.

MR. McINTYRE. I thank the Senator. As I indicated to the Senator privately, I shall have a more detailed statement later on I.R. & D. I will say now, however, that most of the committee agreed that independent research and development is one area where we get great value for our research dollars.

MR. PROXMIRE. *What bothers me about the independent research and development is that there is no accountability.* We were not able to see what we got, and

in case after case, it turned out that the money was spent on matters which have no connection whatever with the military. In one case it was spent on urban development, as I recall. *I believe that if the taxpayer is paying for one purpose, he should have the money spent for that purpose devoted to it.*

MR. STENNIS. Mr. President, will the Senator yield to me further on that point?

MR. PROXMIRE. I yield.

MR. STENNIS. As long as we are speaking about where the credit goes, the Senator from Wisconsin is entitled to a great deal of credit on the item of research as a whole, and that specific part to which he has just referred, the independent research. In the Proxmire amendment and then in the Proxmire bill, he has not only brought a fine, intelligent focus on and presentation of it, but he has spurred us on in our work as well, and I want to publicly thank him now, as I have already done in private. [Emphasis added.]

After Senator McIntyre, Chairman of the Ad Hoc Subcommittee on Research and Development, had given a detailed account of the subcommittee's perceptions and recommendations (116 Cong.Rec., Part 19, at 26361–63). Senator Proxmire sought direct confirmation of his own understanding of the purpose and effect of the proposed amendment to the House version of H.R. 17123, as follows (116 Cong.Rec., Part 19, at 26363–64):

MR. PROXMIRE. I congratulate the Senator from New Hampshire on an excellent speech and for the excellent job he has done in respect to the complex subject. I have talked to a number of Senators who have told me that Senator McIntyre has done remarkable work in this area for several reasons. For one thing, it is complicated. Few people are aware of it. It was brought up last year and a number of the members of the committee said that they knew nothing or very little about it. So that the Senator from New Hampshire has gotten into a field that has been so complicated there has been little knowledge, dis-

cussion, debate, or very little understanding about it.

In the second place, as I understand the thrust of the recommendations of the Senator which he has listed to the purpose of the recommendations, they are not to discourage military research. Quite the contrary. *The purpose of the recommendations is to encourage research and make it relevant and more effective, and to permit the Department of Defense and those who have the responsibility in Congress and elsewhere to know what is going on* and what is being done, so that we will be in a position 'to appropriate money with critical understanding and knowledge.

I should like to ask the Senator from New Hampshire if that is not his principal objective?

MR. McINTYRE. I would say to my good friend from Wisconsin that the subcommittee's recommendations to the full committee, and the committee's adoption of them, constitute a genuine attempt to improve rather than curtail our defense research programs.

Last year, when the Senator from Wisconsin offered his amendment, it was a big surprise to me. Even though I had been chairman of the Subcommittee on Research and Development and was, presumably, somewhat knowledgeable in the whole field, I had never heard of independent research and development. As the Senator knows, it does not exist within the R.D.T. & E. section of the budget. It is actually found scattered all through the procurement items.

For this reason, we regarded the amendment of the Senator from Wisconsin as an open invitation to examine into this field, to see what we could do about bringing a quiet hand of control over an area of defense expenditures which no one in Congress knew very much about. *We feel that our amendment will serve to keep the feet of the Department of Defense to the fire in its pledge to improve its administration of this program.*

MR. PROXMIRE. *Let me see if I understand how the distinguished Senator from New Hampshire would go about this.*

*In the first place,* the committee recommends that the Department of Defense will work with the big contractors, those who receive $2 million or more. This would cover not only what is technically called independent research and development but also bids and proposals and other technical efforts. Those two categories have been vague and ill defined. As a matter of fact, as I recall, even at the hearings, there was some disagreement as to what that meant. But this $2 million would be required in advance to cover those two categories; is that not correct?

MR. McINTYRE. That is right.

MR. PROXMIRE. *In the second place,* as I understand it, *it requires* that there be a technical evaluation by Defense—the committee recommends that there be—*that the agreement be accompanied by a technical evaluation, so that there will be some clear understanding of* the negotiations, *how it relates to the defense effort,* what it would contribute to, and whether it would be worth the amounts required.

MR. McINTYRE. The Department of Defense does give a certain amount of time already to evaluation of brochures submitted by companies on these [I.]R. & D. programs.

MR. PROXMIRE. That is about it. That has been the trouble. They look in the brochures and evaluate them, but this would go farther than just evaluating a brochure put out by a company. Those companies are skillful in making their brochures look attractive, but *we must go behind the brochures to determine what the money is actually going to buy,* and try to determine not only what the costs will be for each item but whether the items are technically feasible.

MR. McINTYRE. I agree wholeheartedly. I would also point out to my good friend from Wisconsin that when we speak of brochures, we are speaking of very sizable items.

They are often two or three times the size of a phone book of a large metropolitan area.

The word "brochure," as such, is really a misnomer. These brochures are vast and complicated.

MR. PROXMIRE. I did not mean to impugn them just because we called them brochures. What I meant was, to be somewhat skeptical about what the DOD is doing, whether it is doing a reasonably good job now in evaluating independent research and development.

The General Accounting Office had a very difficult time getting examples from them, and those we did get indicated very often that substantial expenditures were made in areas that did not have the remotest connection with defense. It would take a great imagination to conceive of ways in which they could have been related to defense. They were connected with urban renewal. One case I recall was devoted completely to domestic efforts, which might have been commendable but should have been specifically authorized and should not have been paid for under the guise of being for defense.

*As I understand it, this evaluation will determine not only costs but also the feasibility and its relevance to defense work.*

MR. McINTYRE. That is right.

MR. PROXMIRE. That is underlined by the third amendment—*the third recommendation* to which the Senator from New Hampshire referred *that no payment would be made for either I.R. & D. bids and proposals or other technical efforts which are not relevant to the purposes of the Department of Defense.*

MR. McINTYRE. That is our hardnosed position at this time.

MR. PROXMIRE. *Finally,* I think the proposal made by the Senator from New Hampshire, that the ceiling of $625 million [im]posed, is realistic and sensible. *It is very important to get that ceiling,* not only from the standpoint of saving the taxpayers' money in areas where we have not really known what it has gone for, but much more important, to provide an incentive for the Department of Defense to make sure that the limited amounts of money for the projects will be for projects to help give this country its strongest military force.

MR. McINTYRE. I hope that my good friend from Wisconsin understands that our ceiling is directed to the 50 companies doing $2 million or more work, which, we have found, account for 95 percent of all auditable I.R. & D. payments, but that there is a leeway over and above the ceiling of $625 million that could encompass another $20 to $40 million for the thousands of smaller companies which do some of this I.R. & D. work.

MR. PROXMIRE. I think that is a practical accommodation, especially for a first effort. I hope that the committee, when giving its attention to this, will watch how it operates, and will consider the possibility of, perhaps, extending the ceiling further, especially if the area of I.R. & E. expenditures, which is exempt, should turn out to be greater than the $25 million or the $30 million which is anticipated. [Emphasis added.]

\*　　\*　　\*　　\*　　\*　　\*

After setting forth his own assessment of the problems associated with IR&D and the need for remedial legislation,[5] Senator Proxmire unreservedly endorsed the adequacy of of the committee and subcommittee recommendations, as follows (116 Cong. Rec., Part 19, at 26365):

Mr. President, *I feel that these recommendations will provide the needed controls over the independent research and development program.* While they do not include all of the provisions of S. 3003, I urge the Senate to accept the committee's amendment. Once again I want to commend the fine work of the distinguished Senator from New Hampshire (Mr. McIntyre) and the other members of the Research and Development

5. 116 Cong.Rec., Part 19, at 26364–65.

Subcommittee for the excellent job they did in looking into this extremely complicated and difficult program. I believe their recommendations will solve many of the problems which have plagued the independent research and development program. They will strengthen not only the administration of the program but also guarantee that all work done will be of value to the Department of Defense. I am delighted that the committee has accepted the major part of my proposal and that the committee's recommendations have been largely accepted by the Department of Defense. *I urge that the Senate approve the committee amendment.* [Emphasis added.]

Despite subsequent objection by Senator Cranston to both the ceiling limitation and relevancy requirement of the committee provision,[6] the Senate passed H.R.17123 on September 1, 1970, with the committee version of section 203 intact. 116 Cong.Rec., Part 23, at 30724.

On September 14, 1970, the House disagreed to the Senate amendments to H.R. 17123 and called for a conference. 116 Cong.Rec., Part 24, at 31437. Senate and House conferees were thereafter appointed. 116 Cong.Rec., Part 24, at 31764, 32191.

On September 26, 1970, the conferees issued their report. H.Conf.Rep.No.91–1473, 91st Cong., 2d Sess. The report explained the actions taken with respect to IR&D as follows (at 21–22):

The Senate adopted language in Section 203 which provided for the following:

(a) Restricted payments to contractors for independent research and development (IR&D), bidding and proposal (B&P) and other technical effort (OTE) work which is relevant to Defense functions and operations.

(b) Required negotiation of advance agreements with all contractors who received more than $2 million in IR&D, B&P, or OTE in their last preceding year.

(c) Required that negotiations of advance agreements be based on submitted plans and a technical evaluation of the IR&D portion of those agreements.

(d) In the event negotiations are held with any company required to enter into an advance agreement, but no agreement is reached, reimbursement would be made in an amount substantially less than the contractor otherwise would have been entitled to receive.

(e) The Department of Defense was required to report to Congress with regard to IR&D, B&P and OTE expenditures.

(f) Established a ceiling of $625 million on payments to be made pursuant to advance agreements negotiated under the act, and

(g) Repeal of Section 403 of the fiscal year 1970 act which limited payments for IR&D, B&P and OTE to 93 percent of the total cost contemplated by the Department.

The House version of the bill contained no comparable language.

Early this year a House Armed Services Subcommittee held hearings and issued a report on IR&D. The Subcommittee concluded that the control of defense expenditures for IR&D, B&P and OTE could be achieved through improved administration, coupled with adequate oversight, rather than through legislation. The recommendations of the Subcommittee were similar to the Senate language ·with the exception of the establishment of a ceiling and the section regarding relevancy.

The Senate conferees maintained that greater congressional oversight was necessary to assure adequate controls over governmental payments for IR&D, B&P and OTE to defense contractors. *The House conferees acceded to the Senate where the language coincided with its subcommittee recommendations.* However, in the opinion of the House conferees, specific ceilings on the total DOD reimbursement and the language with respect to relevancy were not acceptable. [Emphasis added.]

6. 116 Cong.Rec., Part 19, at 26365–67.

### Control through restrictive congressional ceilings

The provisions of the Senate language established a ceiling of $625 million for the DOD reimbursement of IR&D B&P and OTE costs to approximately 50 major contractors and was applicable to payments under cost type contracts only. The House conferees considered this provision as a line item in the authorizing procedure. During its hearings, it was established that such a line item provision was administratively impractical. Moreover, upon examination of the computation of the Senate ceiling amount, in the view of House conferees, it was found that it was at best, an arbitrary amount, and there were questions as to the relationship of the ceiling with costs incurred by the affected contractors and contracts. The Senate conferees conceded to the House position and the language related to the establishment of a ceiling was deleted.

### Relevancy

The House conferees agreed with the basic aim of the Senate language which required that payments should be made only for IR&D, B&P and OTE that was related to department functions or operations. However, with respect to basic research conducted as IR&D it cannot always be directly related to a DOD operation or function. Basic research is that type of research which is directed toward increase of knowledge in science rather than an application to a specific product. The development of such fundamental achievements in science is vital to military research and national interests. The House conferees were of the opinion that the relevancy phrase in the Senate language would unduly inhibit the conduct of needed basic research. The conferees agreed to delete the reference to relevancy and substitute the words "in the opinion of the Secretary of Defense, a potential relationship to a military function or operation" to assure a broad interpretation of the relationship of basic research to military requirements.

### Other Technical Effort (OTE)

The conferees agreed to eliminate legislative references to OTE because of the lack of specific definition of this category of cost. The Department in its testimony before the House Subcommittee on IR&D stated that OTE as a category of cost would no longer be used and that greater efforts would be made to correctly classify "OTE" costs as IR&D or B&P, or otherwise in the negotiation of agreements and contracts.

Most pertinent for present purposes is the statement in the conference report to the effect that the House conferees had only agreed to those provisions of section 203 that harmonized with the recommendations of the House Subcommittee on IR&D. That subcommittee, it will be recalled, only agreed to the mandatory requirement for advance agreements by large contractors on condition that " * * * the use of cost sharing arrangements be eliminated." Report of Subcommittee of Committee on Armed Services, 91st Cong., 2d Sess. (September 18, 1970) at 15. The House agreed to the conference report on September 29, 1970. 116 Cong.Rec., Part 25, at 34161.

In reporting the results of the conference to his Senate colleagues Armed Services Chairman Stennis frankly acknowledged the intransigence and resultant predominating influence of the House conferees on the shape of the compromise agreement. He explained (116 Cong.Rec., Part 26, at 34581):

> Mr. President. Senator McIntyre will comment at length on the final provision with respect to I.R. & D. The key feature of the Senate provision was the $625 million ceiling which would have been imposed on the level of effort in this activity. The House would accept no dollar limitation on this matter. Certain language was agreed to, however, which does require advance agreements between the Department of Defense and the contractor.

> Mr. President. *I greatly respect the position of the House but at the same time I exceedingly regret that more*

progress could not be made in the control of the so-called I.R. & D. activity. It is my observation that this program has not been properly managed in the Department of Defense for the past few years and much needs to be done to prevent abuse in this program which is now at an estimated cost of about $700 million a year.

I firmly believe that this entire matter should be kept under continual and intensive oversight by the Congress and I wish to give notice at this time that I intend to pursue this course of action. No program, however important, is not properly managed if managed in such a way that effective legislative oversight is impossible.

We had some sharp disagreement with reference to the language that goes to the research problem and the independent research problem. It is an important matter, but it is a problem to get it in such shape that Congress can give it proper legislative surveillance, because proper legislative surveillance is something which is more important than the exact amount we might appropriate for items. We can well disagree as to amounts, but we should all agree that an item is not to be approved unless we can have some semblance of a reasonable legislative surveillance and supervision over it, varying according to degree to the subject matter.

*We got the best we could with reference to this research.* The conferees did everything they could. *Someone asked me: "Why did not the House conferees agree more than they did with reference to the amendments?"* I am sure they were as honest and sincere as we were, but I remember that our former colleague from Arizona, Carl Hayden, gave a mighty good answer here, one time, on a conference report, where he was sharply questioned by someone as to why the Senate did not get a better agreement and specifically why the House would not agree on that point. He said, "Well, they were opposed to it."

I cannot improve on that. *They were just opposed to a lot of these provisions.* And, as I say, I am sure it was in all sincerity.

I think it is something that can be and should be worked on more. We should keep on, and we will get a better system out of it.

I am going to insist on the Secretary of Defense and Dr. Foster, the Assistant Secretary of Defense in charge of research and development helping to formulate a better plan that, regardless of the amount of money, can be handled in such a way as to have this surveillance on independent research and development. I fully recognize its importance. But I think that we must have a better system. [Emphasis added.]

An ensuing colloquy between Senators Proxmire and McIntyre left no illusions but that only two possible controls on IR&D spending remained after the conference action; the advance agreement requirement for large contractors and the hope for a more thorough technical evaluation by DOD of contractors' IR&D proposals. The colloquy was as follows (116 Cong.Rec., Part 26, at 34587–88):

MR. PROXMIRE. *Let me get a little further into the independent research. This was, in my view, gutted by the action of the conference committee.* The bill as it emerged from the Senate Armed Services Committee, and as it passed the Senate, established a ceiling of $625 million on independent research. That represented a reduction from 1969 when there was a $759 million expenditure on research and development. That was one distinct contribution to limit independent research and development.

In the second place, the Senate required the Defense Department to negotiate an advance agreement with independent contractors with respect to research and development.

Third was the attempt by the Senate to close loopholes whereby funds disallowed for one category could be used in another category.

It is correct that the conference committee eliminated the ceiling?

MR. McINTYRE. The Senator is correct.

MR. PROXMIRE. Mr. President, is the Defense Department required to negotiate advanced agreements with contractors?

MR. McINTYRE. *The Defense Department is required under the conference report to negotiate advanced agreements. The second part makes certain that the technical evaluation is performed. That is not a cursory matter as we have seen in the past, but is an intelligent searching through the brochures so that we will know as best we can what the particular company is doing on ongoing research.*

MR. PROXMIRE. How about the capacity to shift funds from one category to another?

MR. McINTYRE. Funds may be identified as I.R. & D. or B. & P., as appropriate but, under the language as agreed in conference, the category of OTE was eliminated.

MR. PROXMIRE. It was my understanding that the ceiling that the Senate adopted of $625 million was left out and no ceiling was included by the conference committee.

MR. McINTYRE. That is correct.

MR. PROXMIRE. That was the ceiling we agreed on.

MR. McINTYRE. That $625 million was overall. That is gone.

MR. PROXMIRE. It is my understanding that the $625 million referred to 50 large contractors.

MR. McINTYRE. The Senator is correct.

MR. PROXMIRE. That is gone?

MR. McINTYRE. That is gone, the overall ceiling.

MR. PROXMIRE. But there is a ceiling with respect to certain contractors. Which contractors are they?

MR. McINTYRE. There is a ceiling to establish those contractors who are subject to advance agreements. It applies to those contractors who receive more than $2 million from DOD for independent research and development or bid and proposal.

MR. PROXMIRE. But there is no overall dollar ceiling. So, the Senate conferees gave in on the relevancy factor, leaving the judgment to the Secretary of Defense, and they eliminated the dollar ceiling on independent research and development.

MR. McINTYRE. The Senator is correct.

MR. PROXMIRE. Mr. President, once again I pay tribute, as I have so often, to the Senator from New Hampshire. I think that he did a marvelous job in the committee and on the floor on this matter. However *I am greatly disappointed and depressed that the conference committee did not stand hard and fast on this matter.*

It seems to me that we never get a satisfactory explanation, and neither does the public as to this enormous amount of money that the Federal Government pays every year for something vaguely called independent research and development. It has never been defined. We find that contractors are spending this money on various things that have not the slightest reference to military expenditures. We find that we are spending some of it on strictly commercial activities.

*What these people with the big corporations are doing is having the Federal Government provide the money to maintain a stable of engineers that they can use in any way they wish. It is very unfair when they are competing with other private firms that do not have the advantage of having a defense contract.*

I am happy that the Senator from New Hampshire has assured us that he is not giving up and that he will attempt in the future to get a clear definition and have some definite understanding on the part of Congress as to what is done with the money of the taxpayers of this country.

MR. McINTYRE. Mr. President, let me say to the Senator from Wisconsin,

since the Senator brought this to the attention of the committee last year, I believe, that we feel even with the disappointment of having to abandon this and having it watered down, we are nevertheless on the right track.

The Department of Defense has admitted to some of their failings. They are hard at work trying to get the matter under control.

*We got a feeling of mutuality from the House Committee when it came to technical evaluation.*

Our committee will try to keep a sharp eye on it. We are making some progress along the lines that my friend, the Senator from Wisconsin, had hoped for when he brought this matter to our attention. [Emphasis added.]

\* \* \* \* \* \*

The Senate agreed to the conference report on October 1, 1970 (116 Cong.Rec., Part 26, at 34601) and 1 week later the President signed H.R.17123 into law as Pub.L.No.91–441.

The materials detailed above comprising, so far as research has disclosed, all relevant indicia of Congress' aim in adopting the provision in issue, convincingly demonstrates that the principle of cost sharing was not intended to play any part in ascertainment of the dollar ceilings to be negotiated for purposes of mandatory advance agreements limiting contractor reimbursements for IR&D costs. However appealing, as a matter of policy, the utilization of cost sharing as a rational and effective deterrent to overreaching by large contractors in their conception and implementation of IR&D programs, the plain fact is that no one in the Congress, including Senator Proxmire, the most staunch advocate of the necessity to curtail contractor abuse, affirmatively endorsed cost sharing as an appropriate or desirable instrument for control. As the prime mover of both the legislation here involved and its immediate predecessor, Pub.L.No.91–121, Senator Proxmire never deviated from his repeatedly announced thesis that the two basic flaws in the IR&D programs administered by DOD were; first, the absence of any upper limit on the amount of funds that it could disburse annually to the contractor community at large for such purposes; and second, the lack of any real assurance that the IR&D work subsidized by DOD actually related to defense procurement objectives as opposed to the development of civilian business. In the latter connection, he never suggested that a contractor should be made to bear any part of the costs incurred by him for IR&D that in fact pertained to the defense effort. Indeed, as revealed by his floor colloquy with Senator Symington, *supra,* he expressly disclaimed any such intention. In the instant case, however, the defendant's position is precisely that it could require AESC to enter into an advance agreement embodying a dollar ceiling on reimbursement ($950,000) that was purposely depressed as a means of requiring plaintiff to absorb the excess portion of $1,084,438.57 in IR&D costs that were concededly reasonable in amount, allocable to DOD contracts and therefore incurred by it " \* \* \* for projects that had a potential relationship to a military function or operation." Findings 14, 16. Despite his obvious good faith and the persuasive logic of his position, when considered as an original proposition, the contracting officer's insistence on plaintiff's sharing of any part of those costs was simply unwarranted by the direct language and discernible intent of Pub.L.No.91–441, the criterion by which the validity of his actions must be gauged. However great the temptation, it must be remembered that it is not the function of a court to engraft on a statute additions which it thinks the legislature might or should have made. *United States v. Cooper Corp.,* 312 U.S. 600, 605, 61 S.Ct. 742, 85 L.Ed. 1071 (1941).

Accordingly, on the undisputed facts of record in this proceeding plaintiff must prevail as a matter of law.

## CONCLUSION OF LAW

Upon the foregoing opinion and the findings of fact which are made part of the judgment herein, the court concludes as a

matter of law that plaintiff is entitled to recover and judgment is therefore entered for plaintiff in the amount of three hundred sixty-eight thousand, nine hundred sixty-three dollars and sixteen cents ($368,963.16).